**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| FACTOR2 MULTIMEDIA SYSTEMS, LLC, | |
| Plaintiff, | |
| v. | Case No. 6:24-cv-00362-XR |
| EARLY WARNING SERVICES, LLC, et al., | |
| Defendants. | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM (ECF 63)**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     LEGAL AUTHORITY ....................................................................................... 3

III.    BACKGROUND ................................................................................................ 5

IV.    THE ASSERTED GROUNDS FOR INVALIDITY CANNOT BE DETERMINED IN A RULE 12(b)(6) MOTION ................................................................................ 7

      A.     Collateral Estoppel ...................................................................... 7

      B.     35 U.S.C. § 101 ......................................................................... 10

V.     THERE IS NO EVIDENCE IN THE RECORD TO SHOW THAT EACH OF THE ASSERTED PATENTS RECITES THE SAME SUBJECT MATTER. ........................... 11

      A.     The System Claims Survive the Motion to Dismiss .............................................

      B.     The Method Claims of the Asserted Patents Each Claim A Distinct Invention From The '432 Patent. ...................................................................... 14

      C.     There is No Evidence in the Record to Overcome the Presumption of Validity. .................................................................................................. 15

VI.    THE ASSERTED PATENTS ARE VALID UNDER § 101 ............................................. 16

      A.     Legal Principles Governing Patent Eligibility ................................................. 16

      B.     *Alice* Step 1: The Claims Are Not Directed to an Abstract Idea. ..................... 17

      C.     *Alice* Step 2: The Claims Contain an Inventive Concept. ................................. 22

      D.     The U.S.P.T.O. Patent Eligibility Guidelines Indicate The Claims Of The Asserted Patent Are Directed To Patent Eligible Subject Matter. ..................... 24

VII.   CLAIM CONSTRUCTION ISSUES RAISED BY DEFENDANTS PREVENT THE COURT FROM DECIDING INVALIDITY ON A 12(B)6 MOTION ............................ 28

VIII.  WILLFUL AND INDIRECT INFRINGEMENT ............................................................ 29

IX.    IN THE ALTERNATIVE, LEAVE TO AMEND THE COMPLAINT SHOULD BE GRANTED ...................................................................................................... 30

X.     CONCLUSION ................................................................................................ 30

## **TABLE OF AUTHORITIES**

**Cases**

*Aastrix Software Inc. v. Green Shades Software Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2016)....... 13

*Aastrix Software Inc. v. Green Shades Software Inc.*, 890 F.3d 1354, 1358 (Fed. Cir. 2018) ...... 13

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014)......................................... 27, 33

*Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018)........................ 31, 32

*Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)*.................................................................................. 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).................................................................... 4

*Content Extraction and Trans. v. Wells Fargo Bank*, 776 F. 3d 1343, 1349 (Fed. Cir. 2014) ...... 39

*CosmoKey v. Duo*, 15 F.4th 1091, 1097 (Fed. Cir. 2021) ........................................................... 31

*CosmoKey v. Duo*, 15 F.4th at 1099 (Fed. Cir. 2021) ............................................................... 6, 34

*Diamond v. Diehr*, 450 U.S. 175, 187-88 (1981) ......................................................................... 28

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016)....................................... 31

*Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) .............................................. 4

*Lone Star Fund V (US), L.P. v. Barclays Bank PLC*, 594 F. 3d 383, 387 (5th Cir. 2010)............... 4

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78–79 (2012) .................... 31

*Prism Techs. LLC v. T-Mobile USA, Inc.,* 696 F. App'x 1014 (Fed. Cir. 2017)........................... 16

*Quantum Stream Inc. v. Charter Commc'ns, Inc.,* 309 F. Supp. 3d 171, 181 (S.D.N.Y.) ............ 27

*TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020) ...................................... 6, 31, 32

*Universal Secure Registry LLC v. Apple Inc.,* 10 F. 4th 1342, 1346 (Fed. Cir. 2021) ................. 33

**Statutes**

35 U.S.C. § 101 .......................................................................................................................... 12, 17

35 U.S.C. § 282 ............................................................................................................................. 8, 18

Fed. R. Civ. P. 12(b)(6) ................................................................................................................. 3

## I.     INTRODUCTION

Defendants have failed to establish by clear and convincing evidence, that each of the claims of  each of the six Asserted Patents[1]  are invalid under 35 U.S.C. § 101.  Defendants have failed to analyze the claim language of four of the six patents completely, and have ignored the vast majority of the claims in the two patents that were analyzed.  They have failed to acknowledge that the six patents have significant differences in their disclosures and distinct claims, instead presenting only a single claim from two of the Asserted patents – while ignoring more than 170 claims of the Asserted Patents entirely.  Defendants' failure to analyze each of the claims in the Asserted Patents alone is enough to deny the Motion to Dismiss premised on § 101 grounds.

Defendant is also incorrect in implying that the patent disclosures are substantially similar to each other.  (See, e.g., Motion at 2.)  For example, a comparison of U.S. Patent No. 10,083,285 (one of the Asserted Patents) with the original 8,266,432 Patent demonstrates that none of the four Figures in the '285 Patent are found in the '432 Patent and that the vast majority of the text of the '285 patent is different form the text of the '432 patent.  For example, the '432 Patent has only 6 columns of text, while the '285 Patent has 12+ columns in the specification.

In addition, Defendants have given no weight to the fact that many of the current claims at issued were drafted and examined after the U.S.P.T.O. issued new guidance regarding patent eligibility.  A comparison of the claims of the Asserted Patent method claims with the claims of the '432 Patent and the Virginia Court decision demonstrates several significant differences.

For example, the Virginia Court focused on the terms "a user" and "an external entity" and "a central entity" in its analysis of the '432 Patent claims.  Invalidated Claim 1 recites:

---

[1] The "Asserted Patents" are: U.S. Patent No. 8,281,129; U.S. Patent No. 9,703,938; U.S. Patent No. 9,727,864; U.S. Patent No. 9,870,453; U.S. Patent No. 10,083,285; and U.S. Patent No. 10,769,297.

"A method for authenticating **a user** during an electronic transaction between the user and **an external-entity**, the method comprising: receiving electronically a request for a dynamic code for the user by a computer associated with **a central-entity** during the transaction between the user and the external entity;"

The Virginia Court erroneously characterized this element as describing a participant, a second participant in a transaction, a third party intermediary and a code:

"However, despite the electronic setting and purportedly Internet specific problem addressed, the patent claims are directed to a common method for solving an old problem. The claims are directed to the abstract idea of using a third party and a random, time-sensitive code to confirm the identity of a participant to a transaction. This formulation is admittedly verbose. It is verbose because the patent claims combine two abstract ideas: the use of a third party intermediary to confirm the identity of a participant to a transaction and the use of a temporary code to confirm the identity of a participant to a transaction."

*Asghari-Kamrani v. USAA,* 2016 WL 3670804, *13 (EDVA No. 2:15-cv-00478, July 5, 2016).[2]

However, many of the present claims have been drafted to clarify those aspects that the Virginia Court misconstrued and to thereby distinguish over the court's six-year-old holding.  For example, Claim 19 of the '297 Patent (unaddressed in Defendants' Motion) claims; "A system for enhancing computer network security comprising one or more computer devices."  In this claim, the *system* exchanges a series of codes and responses.  There are no outside participants or third party intermediaries that perform any of the recited steps.  Thus Defendant's broad, unsupported assertion that all six patents can be easily swept away without in-depth analysis simply because they are related either directly or  indirectly, is unsupported by facts.

 Defendants' analysis is based on attorney argument only, and has thus failed to demonstrate by clear and convincing evidence that the claims of the Asserted Patents, which are directed to a method for authenticating user credentials in e-commerce applications, (i) are abstract ideas and (ii) do not contain inventive concepts, where the specifications for the patents

---

[2] Throughout this brief, the term "Virginia Court" refers to the court that rendered this decision.

identify a real-world problem which could not be solved by an unaided person, of collecting and relaying dynamic codes between multiple users, decoding and analyzing those dynamic codes, matching the dynamic codes to the user identity, and reporting the analysis to the e-commerce computer.  The Asserted Patents further claim a specific analysis solution using dynamic code generation and real-time identity authentication methods in a new and unconventional way to improve authentication technology.

But the Defendants' analysis shortfall doesn't end there.  As described below in **Section IV.B and VI.D**, the U.S.P.T.O.'s "Subject Matter Eligibility Examples: Business Methods," published in December 2016 – after the Virgina Court ruling and thus not part of the district court or appellate consideration – show conclusively that the claims of the Asserted Patents *are* directed to patent-eligible subject matter.  (See **Exhibit A**.)  Defendants' failure to apprise the Court of these updated U.S.P.T.O. guidelines is significant.  Defendants would have this court simply adopt a six-year-old decision in a rapidly-evolving are area of law while ignoring the Patent Office's clarification to its examination guidelines based directly on those changes in case law.  This, coupled with the failure to provide any analysis of the vast majority of the Asserted Claims should result in the Motion being denied.

## II.    LEGAL AUTHORITY

Under Rule 12(b)(6) of the Federal Rules of the Civil Procedure a complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  To meet this plausibility standard, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id*. The court accepts as true the complaint's undisputed factual allegations and construes them in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

"The court's task is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Lone Star Fund V (US), L.P. v. Barclays Bank PLC*, 594 F. 3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). Plaintiff need not provide detailed factual allegations, but need only provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A Rule 12(b)(6) motion does not determine the merits of the action but rather tests whether sufficient facts are alleged to support a plausible claim. Defendants' motion erroneously requests this Court to make factual findings, construe patent claims unreasonably and adverse to Plaintiff, and determine the merits without the benefit of discovery, evidence, expert testimony and testimony of one skilled in the art.

Controlling and persuasive legal authority including Supreme Court, Federal Circuit, U.S.P.T.O patent examination guidelines (Example 35 discussed below, allowing patentability because the claim "set up a sequence of events that address unique problems associated with bank [transactions]"), and other district court cases dealing with similar technology as this case – all conclude claims similar to the Asserted Patent claims here are patent eligible. See, for example: *Diamond v. Diehr*, 450 U.S. 175 (1981) (finding patentable an invention that improved prior art molding methods by "constantly determining the temperature of the mold, constantly recalculating the appropriate cure time through the use of the formula and a digital computer, and automatically opening the press at the proper time"); *Thales Visionix Inc. v. United States*, 850

4

F.3d 1343 (Fed. Cir. 2017) (reversing district court's dismissing and concluding claims that recite an unconventional arrangement of conventional components (inertial sensors) are patent-eligible; *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) ("claims purporting to improve the functioning of the computer itself, or improving an existing technological process, might not succumb to the abstract idea exception.") (quotes and cites omitted); *CosmoKey v. Duo*, 15 F.4th at 1099 (Fed. Cir. 2021) (authentication patent claims were sufficiently specific because contained four claim steps that were not mentioned in prior art); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020) ("[i]mproving security ... can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem"); *Horizon Glob. Americas Inc. v. Cont'l Auto. Sys., Inc.*, No. 2:20-CV-10536, 2021 WL 795569 (E.D. Mich. Mar. 2, 2021) (denying motion to dismiss under 35 U.S.C. § 101 because defendant had not met its burden of proving the Patents invalid by clear and convincing evidence).

The Court might also take into consideration that Congress is currently consideringthe Patent Eligibility Restoration Act of 2024 (PERA) that "would explicitly eliminate all judicially-created exceptions to U.S. patent eligibility law."[3]  The stated goal of the bill's sponsors is to pass PERA and have it signed before President Biden leaves office.  Passage of PERA will significantly impact the patent-eligibility analysis presented in Defendants' Motion.

## III.    BACKGROUND

The inventors began working on the inventions claimed in the Asserted Patents in approximately 1998.   In the early days of the Internet, passwords were the default security mechanism used throughout the online world.  However,  even novice hackers could infiltrate

---

[3] See, e.g., https://ipwatchdog.com/2024/09/06/bites-barks-house-pera-judicial-council-confirms-extension-newman-suspension/id=180962/

password-protected computers or online accounts. The alternatives to passwords were also not workable at that time, and biometrics were not commercially available on a large scale and to the extent they were, they were prohibitively expensive. Other solutions, such as smart cards required significant investment in the physical cards themselves and their accompanying reader devices, which were difficult to configure and typically not interoperable.

At this same time, the U.S. Federal Trade Commission asked for public comment regarding the notable lack of acceptable digital authentication (or digital signature technologies) available to the public. (See **Exhibit B** – November 30, 2002 Children's Online Privacy Protection Rule Amended – Comment P994504.) During the comment period, multiple large online service providers voiced their support for finding "new digital signature technologies" that up to that point had not progressed due to costs and technological barriers to employing a widespread solution. (*Id.*)

It was with this environment as the background that the inventors filed their first patent application directed to a "Centralized Identification And Authentication System And Method" in August 2001.[4] a solution for identity authentication of online consumers that was simpler than the then current technology. The goal was to develop an authentication system that (1) was widely available in the digital world; (2) was capable of handling massive numbers of verifications at the same time; (3) did not require additional hardware (readers, fobs, etc.); (4) was easy to use and manage; (5) was cost effective; and (6) had an extremely low error rate. The Asserted Patents (Exhibits A-F to the Complaint) recount the same failure of others, long-felt needs surrounding the invention that were noted by the FTC, industry players, and others at the time the first patents were filed. (*See, e.g.,* '129 Patent at 1:16-6:40; '938 Patent at 1:31-4:28.)

---

[4] The application issued as U.S. Patent No. 7,356,837 in April 2008. The '837 Patent is not asserted in this case.

This background shows that the inventions claimed in the Asserted Patents were truly inventive as they added "something more" to the existing human and computer-implemented methods.

Crafting a workable solution as embodied in the Asserted Patents required an abundance of computer architect skills, capital, time, and hard work. The resulting centralized authentication system that could authenticate authorized users by providing them computer-generated dynamic codes called "SecureCodes" through a communication network such as email or text messages. This, too, demonstrates the "something more" that is critical to the *Alice* analysis.  At a minimum, these are fact questions that should be resolved and therefore make this Section 101 inquiry unsuitable for resolution on a Motion to Dismiss.

## IV.    THE ASSERTED GROUNDS FOR INVALIDITY CANNOT BE DETERMINED IN A RULE 12(b)(6) MOTION

Patents are entitled to a presumption of validity that can only be overcome by clear and convincing evidence.  35 U.S.C. § 282.  Defendants have provided no evidence in support of ether basis for their assertions of invalidity, whether through the Pleadings, as required by 12(b)(6), or through evidence in the patents or file histories for the majority of Asserted Claims.

### A.    Collateral Estoppel

Defendants raise collateral estoppel stemming from six-year-old proceedings relating to a patent that is not asserted in this case, based upon old case law, and for which earlier rulings should not be carried over to this case.  Put simply, the '432 Patent – although a parent or grandparent application to *only two* of the six patents asserted in this case (the '864 Patent and the '297 Patent) – has claims that are directed to different inventive concepts and a specification that varies decisively from a number of the patents-in-suit.

First, as shown in the patent file history for the '864 Patent, the claims in the '864 Patent were amended *after* the opinion was rendered invalidating claims of the '432 Patent, and the

claims of the '297 Patent were filed years later.  (*See* **Exhibit D** ['864 Patent File History at

August 18, 2016 Amendment and Remarks].)  And, although the '129 Patent issued prior to the

invalidity opinion and order, its claims already contained distinct features that distinguish it from

the '432 Patent claims.  Likewise, the claims of the other three Asserted Patents ('938 Patent,

'453 Patent, and '285 Patent) were amended or drafted after the opinion came down and

specifically recite elements that distinguish the new claims from the claims that were held invalid

by the Virginia district court.  (*See* **Exhibit C** ['938 Patent File History, July 15, 2016

Amendments and Remarks].)

      In asserting that Plaintiff is collaterally estopped from asserting the six patents listed in

the Complaint in this case, Defendants have the burden of demonstrating that *each* of the claims

of *each* asserted patents are directed to the same subject matter as the '432 Patent, and are

therefore not patent eligible.  But Defendants have not done this.  Instead, Defendants recite *a*

*single* claim from *two* of the Asserted Patents and declare that *all* 23 independent claims and all

178 total claims from *all six* patents have similar subject matter and recite the same or similar

elements.  (Motion at 9-12.)  Defendants have thus fallen short at least with respect to the dozens

of other claims in each of the Asserted Patents for which no analysis is provided in the Motion.

      Defendants also incorrectly assert that the claims of the '297 Patent are representative for

purposes of the Section 101 analysis they present in their motion.  (Motion at 15.)  Plaintiff's

Complaint stated only that "[t]he claims of the '297 Patent are representative of the *family* of

patents and are directed to '[a]n authentication system for enhancing computer network

security.'"  (Complaint at ¶ 34, emphasis added.)  This was not an admission, it was an assertion

of notice of Plaintiff's claim for infringement without having to recite all claims from all patents

in the Complaint.   There is no admission nor agreement that all 23 independent claims are

indistinguishable from each other, as Defendants seem to suggest, only that the patents are directed to the same general subject matter. Indeed, the fact that Plaintiff recites a different claim with very different elements in the next paragraph (Complaint, ¶ 35) undercuts Defendants' argument. And, as discussed below, other claims among the 23 independent claims of the Asserted Patents present very different combinations of claim elements for the claimed systems and methods. Defendants cannot carry their burden by simply alleging that all of the claims are encompassed by the two "representative" claims.

And with respect to two Asserted Patents that Defendants did analyze, the claim charts show important differences between claim 1 of the invalidated '432 Patent and claim 1 of the '297 Patent and '129 Patent. While there are some common elements, there are also large passages in the asserted claims that are not present in the 432 Patent, and that form a basis for distinguishing the claims. (*See* additional discussion, below.)

Defendants' omission of discussion on these different claim elements should not be taken lightly, as it is the entire patent claim at issue that must be considered, not just hand-picked elements that are in some respect similar to other claim elements in the '432 Patent. Critically, many of those elements that are not discussed by Defendants provide additional limitations such as which entity/aspect of the system is performing a step, when then step is performed, etc. These elements are not to be overlooked in connection with the U.S.P.T.O.'s analysis of patentability under Section 101. (*See* discussion of U.S.P.T.O. Example 35, *infra*.) Each of these considerations are important in determining patent subject matter eligibility and estoppel claims asserted by the Defendants in the Motion. That Defendants intentionally omitted large swathes of Claim 1 of each patent, while completely ignoring the dozens of other claims in each patent is a strong indicator that Defendants have not carried its burden with respect to the Motion.

9

**B.**     **35 U.S.C. § 101**

As a preliminary matter, patent eligibility under Section 101 of the Patent Act should not be resolved in a Rule 12(b)(6) motion where there are ". . . factual allegations [in the Complaint] that, taken as true, prevent resolving the eligibility question as a matter of law."  *See Aastrix Software Inc. v. Green Shades Software Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2016).  The Federal Circuit has explained that where the complaint contains factual allegations, these allegations are taken as true and a Rule 12(b)(6) motion based on Section 101 must be denied:

> For example, it is alleged that the patents 'improve the functioning of the data processing systems, computers and other hardware' and explained in detail how the invention achieves these improvements. These allegations suggested that the claimed invention is directed to an improvement in the computer technology itself . . . . [n]othing in the limited record we could consider at the 12(b)(6) stage refuted those allegations so there was no legal basis to affirm dismissal . . . we cannot adopt a result-oriented approach to end patent litigation at the 12(b)(6) stage that would fail to accept as true the complaint's factual allegations and construe them in the light most favorable as settled law requires.

*Aastrix Software Inc. v. Green Shades Software Inc.*, 890 F.3d 1354, 1358 (Fed. Cir. 2018).

Here, as cited above, the Complaint contains factual allegations that the claimed invention in the asserted patents is not a computer implementation of a known method, nor an abstract idea.  The claimed method of "enhancing computer network security" adds to the prior art of teaching by capturing the dynamic nature of the Secure Code.

Importantly, although Defendants rely on the Virginia Court's July 2016 district court ruling[5] to argue that the Asserted Patents are invalid under 35 U.S.C. § 101, Defendants did not provide or even mention the "Subject Matter Eligibility Examples: Business Methods" guidelines published by the U.S.P.T.O. ("the Office") in December 2016 which unequivocally establish, based on intervening law, that the subject matter of the Asserted Patents *is* patentable.

---

[5] Defendant did not include a copy of the full unpublished opinion with the Motion to allow the parties and the Court to analyze the text.

(*See* **Exhibit A** at Example 35.)[6]  In the U.S.P.T.O.'s Example 35, the Office details whether certain claims directed to "Verifying A Bank Customer's Identity To Permit An ATM Transaction" constitute patent-eligible subject matter.  (**Exhibit A**, Page 98.)  In that example, the Office presents a set of sample claims, two of which are remarkably similar to those found in the Asserted Patents, in which a computer processor compares user identification information to a "random code" generated and sent to both the customer and the bank.  ( *See* sample claims 2 and 3, at pages 100-101.)  The random code claims are described by the Office as patent-eligible for two reasons: first they "do not represent merely gathering data for comparison or security purposes, but instead set up a sequence of events that address unique problems associated with bank [transactions];" and second, the claims do not merely verify identity by inputting a code on an ATM keypad, but includes use of additional devices and code methods to enhance security. (*Id*. at 103.)  The claims of the Asserted Patents likewise present a patentable sequence of events and combinations of security features that "represent significantly more (i.e., present an inventive concept) because they are a practical implementation of the abstract idea of fraud prevention that performs identity verification in a non-conventional way and non-generic way, even though the seps use well-known components."  (*Id*. at 103.)

## V.    THERE IS NO EVIDENCE IN THE RECORD TO SHOW THAT EACH OF THE ASSERTED PATENTS RECITES THE SAME SUBJECT MATTER.

Defendants rely on the *Ohio Willow* case for the proposition that a patent held invalid on § 101 grounds requires a blind finding that other patents in the same family should also be held invalid on the same grounds.  (Motion at 8.)  However, in the *Ohio Willow* case, the Federal Circuit reviewed ***each*** of the claims asserted by the Plaintiff before finding that collateral estoppel attached.  Here, Defendants have provided only cursory analysis of one claim from two

---

[6] Published online at https://www.uspto.gov/sites/default/files/documents/101_examples_1to36.pdf

of the Asserted Patents, while ignoring nearly two dozen other independent claims and more than 170 total claims across the six patents.[7]  Nor have Defendants explained how the system claims can be invalidated based on a ruling applying the Alice framework to method claims.

Importantly, however, the claims of the '432 Patent differ in material respects from the claims of the Asserted Patents in this case.  In the Virginia opinion, the Virginia Court focused on the ability of a human to accomplish something approximating the methods claimed in the '432 Patent.  However, in doing so, the Court apparently focused on the word "Entity" as if the "entity" were something other than a computer system, holding "entity" to mean a corporate entity.  The Virginia Court interpreted the claims of '432 Patent such that the term "central-entity" is defined as a third party intermediary performing the authentication steps to confirm the identity of a participant to a transaction such as *offline transactions* and later suggesting that the claims of '432 could be performed without computers:

> Like the claims in this case, intermediate settlement could and had been performed without computers. The Supreme **[*14]** Court in Alice had no trouble concluding that intermediated settlement was longstanding "method of organizing human activity." Id. The fact that the patent claims used a computer to perform part of this method was of no consequence.

*Asghari-Kamrani v. USAA,* 2016 WL 3670804 at *13-14.

But in the world of computer security the term "entity" means, for example, computer or computer systems.  The claims of the '129 Patent and in claims of later-issued patents have clarified this difference via the use of terms like website, computer system, authentication system, online computer system, authenticator, etc.  This is not, as Defendants suggest, merely a substitution of words with "minor, non-material variations".  The manner by which the

---

[7] Defendants' inclusion of a chart showing where the language of dependent claims in the Asserted Patents allegedly can be found in similar language in the '432 Patent provides no analysis and falls short of their burden to prove unpatentability.

authentication happens, which "entity"[8] performs each task, and when during the process each step occurs is important to analyzing the scope of the Asserted Patent claims. Defendants, by analyzing only parts of only two of the asserted claims have glossed over this aspect of the case. On this basis alone, the Motion to Dismiss can be denied.

Defendants rely on the *Prism Techs* case for the proposition that "claims related to authenticating a user's identity were abstract." (Motion at 21.) First, the *Prism* case is a non-precedential opinion that is not controlling in this analysis. *Prism Techs. LLC v. T-Mobile USA, Inc.,* 696 F. App'x 1014 (Fed. Cir. 2017). Second, the *Prism Techs* case itself recognizes that the true dispute is whether the patent claims include an inventive concept that would make them patent-eligible. *Id*. at 1017-18. Although the *Prism Techs* court ruled that those patents did not have such an element, it is important to realize that *Prism Techs* did not recite the elements that are found in the Asserted Patents in this case. Moreover, the *Prism Techs* decision does not take into account the U.S.P.T.O. guidance in Example 35 that supports Plaintiff's position that the elements recited in the Asserted Patents render the subject matter patent eligible.

For example, although in an alternate version of an authentication process, authentication *could* happen in person, it would happen in a very different scenario with very different methods and very different applications and actors that would be utterly inapplicable in an online transaction environment. That is, because the claimed communications are themselves online between computers, and recite that they "occur while computers are in communication" it is not feasible to incorporate a human actor or "entity" in these steps, which makes this more than just a computer-implemented method of something that could be performed by a human. (And,

---

[8] The term "entity" is a term that may require claim construction, including the introduction of extrinsic evidence and testimony, in order to resolve the Motion to Dismiss. See below.

notably, these are the very elements that Defendants chose not to discuss in its analysis on pages 9-13 of the Motion.)

And, the method claimed in step 15 of the '129 Patent and the claims of the later-issued patents could not be performed without computers to instantly and securely authenticate dynamic digital codes sent to millions of online users, compare those codes with the user's digital identity, and report back to the online platform *during* the electronic communication.

## A.    The Claims of the Asserted Patents Each Claim A Distinct Invention From The '432 Patent.

One apparent difference between the invalidated claims of the '432 Patent and the method claims of the Asserted Patents is that Asserted Patent claims do not use the terms "Central-Entity" and "External-Entity."  Instead, the terms "trusted-authenticator," "website," "computer system," and "authentication system" are used to distinguish the claimed inventions from the Virginia Court 's analog understanding of the terms and subject matter of the '432 Patent.  (*See*, independent claims of the Asserted Patents.)  Although Defendants argue that these are mere synonyms that do not alter the scope or subject matter, that interpretation is incorrect. Instead, the change in claim terms fundamentally distinguishes the claimed invention from the third party intermediary interpretation adopted by the Virginia Court  based on the specific terminology used in the '432 Patent.  These different claims and claim terms thus clarify that this is an online digital transaction which by its very nature must involve specialized computers performing highly complex operations.

The method claims of these patents are further distinguishable from the '432 Claims as they specifically call for the user to be remote from the Computer System and the Trusted Authentication System – a scenario that conflicts with the Virginia Court's reading of the '432 Patent subject matter.  Likewise, the systems claims that recite a system for implementing

14

methods are distinguishable for the same reasons.  It is clear that no third party intermediary interpretation is required by the claims and it is clarified that the communication between the computing device of the user, the online computer system and the authentication system are performed digitally over the communication network.  The above methods are performed between the computers over the communication network to instantly authenticate the user.  The communication between the user, the computer system and the trusted authentication system are further clarified to show that they are performed *during* an electronic transaction – an element not recited in the '432 Patent.

Additionally, certain claims, such as Claim 16 of the '938 Patent, add multiple computer systems performing different functions, each of which provide additional benefit over both the invention recited in the '432 Patent and in other claims of the Asserted Patents.

The claimed methods thus improve on concepts and methods that cannot be performed without computers.

### B. There is No Evidence in the Record to Overcome the Presumption of Validity.

While it is correct that in clear cases, a court may grant a motion to dismiss premised on 35 U.S.C. § 101, such a dismissal is not appropriate here.  There remains a presumption of validity to an issued patent, and no contrary evidence has been submitted and none is found in the pleadings.  Furthermore, as noted above and below, there are several terms that require claim construction before the scope and therefore the subject matter and patent-eligibility of the claims of the Asserted Patents can be ascertained.

Defendants have not submitted any supporting evidence, only attorney argument.  In a 12(b)(6) motion to dismiss, the evidence of the non-moving party must be accepted as true, especially when there is no contrary evidence.  Counsel's unsupported assertion that a patent is not directed to eligible subject matter is not evidence.

## VI.    THE ASSERTED PATENTS ARE VALID UNDER § 101

### A.    Legal Principles Governing Patent Eligibility

The Patent Act provides that all patents are "presumed valid," and" [e]ach claim of a patent (whether in independent, dependent, or multiple dependent form) [is] presumed valid independently of the validity of other claims." 35 U.S.C. § 282(a). "In light of this presumption of validity, [t]he party challenging the validity of a patent bears the burden of proving invalidity [of each claim] by clear and convincing evidence". *Quantum Stream Inc. v. Charter Commc'ns, Inc.,* 309 F. Supp. 3d 171, 181 (S.D.N.Y.) (citation omitted).

The Asserted Patents claim methods and systems for enhancing network security through use of authentication systems.  The claims are not directed to a mere idea, but to a perceivable system of uniquely interconnected and configured components and processes, which enhances network security and the interoperative functioning of the computers.  The methods and systems recited in the Asserted Patent claims are specific, distinct methods that are not merely concepts. Rather, they add "something more" to the so-called abstract idea.  The resulting inventions claimed in the Asserted Patents neither inhibit further discovery nor tie up building blocks of human ingenuity.

Courts use a two-step inquiry to determine whether claims are ineligible under these exceptions. First, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). If they are so directed, a court then "consider[s] the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Alice*, 573 U.S. at 217.

The Asserted Patents do not claim the abstract idea of <u>authentication.</u> The specific method and systems claimed, as detailed herein, requires the interplay of: several different steps,

devices, users, and entities; the request for authentication; the initial receipt of a user identity and request for authentication; the generation of a dynamic code specific to the user at the specific time requested; and then the transmission of that identity and dynamic code to an online system such as an online website.

Only if a court determines that claims draw upon a patent-ineligible concept, does the court proceed to step two of the *Alice* analysis.  At this step, the court "search[es] for an inventive concept i.*e.,* an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Alice,* 573 U.S. at 217-18 (citation omitted).  Applying this logic, for example, the Supreme Court has found patent-eligible claims for a process of curing rubber that employed a "well-known" mathematical equation where the process "incorporate[d] in it a more efficient solution of the equation." *Diamond v. Diehr,* 450 U.S. 175, 187-88 (1981).

The claims of the Asserted Patents add significant unobvious novelty, and like *Diehr's* "more efficient solution," the method claimed for enhancement of network security provides a solution that is efficient and cannot be performed without a computer because network security only exists in the context of computers.  By enhancing the security of a network, the function of the computers is enhanced.

B.    *Alice* **Step 1: The Claims Are Not Directed to an Abstract Idea.**

The claims of the Asserted Patents are directed to statutory subject matter.  The inventions embodied in the Asserted Patents are not an abstract idea, but provide key steps, and with respect to the system claims, specific hardware, that pushes the claims beyond any abstract idea and makes the invention specific and concrete.  The authentication methods claimed in the Asserted Patents are not simply abstract ideas, nor are they known steps that could be performed without computers for several reasons.

17

First, attempting to replace computers with humans performing a mental or pen and paper method would eviscerate the security purpose of the claimed authentication method. In the security context, computers are incapable of self-interest and fraud, especially in a situation of complete anonymity, such as disclosing a security code to another without authorization. This fundamental difference from humans is critical to the invention. Therefore, unlike examples where a conventional human process is simply being performed on a computer, in the claimed context of computer network authentication there is no genuine analog whereby humans can provide the required level of security. These claims are therefore also tied to and the inventive concept improved by the computer technology through their core goal of providing enhanced network security. Put in terms of the PERA Bill now before Congress: a "process that cannot be practically performed without the use of a machine (including a computer)."

Second, the claimed "SecureCode" "dynamic code" or "digital code" is designed to be valid for a predefined short period of time and once only. Attempting to replace the computers with humans performing a pen and paper method would destroy the security goals of the security code and the ability to communicate valid codes. Humans performing a pen and paper authentication (as envisioned by the Virginia Court) would be unable to reliably invalidate or discard the security code immediately after its use or within a short time window. This failure of human implementation opens the door for fraudulent transactions due to the potential that a code might be used multiple times before being invalidated or revoked by a human intermediary.

Third, attempting to replace computers with humans performing a manual method would undermine the low cost and easy-to-use purpose of the claimed authentication method. Writing the codes on a pieces of paper and securely providing them to millions of users without involvement of computer systems is an impossible task for humans, and increases complexity

and cost. These claims are therefore also inextricably tied to computer technology by their purpose of providing easy to use and low cost authentication methods to enable online businesses to increase security while reducing complexity and cost of providing services over the computer network such as internet to millions of remote users. See, e.g., **Exhibit B** (Federal Trade Commission Comments regarding complexity and cost barriers).

Fourth, the Federal Circuit and multiple district courts have repeatedly held computer systems performing specific algorithms to be patentable. (See discussion below.) The claims in the Asserted Patents recite predefined forms of communication between authentication computer system and online computer system in predefined forms of communications with an electronic device of the user, generating the security code and making sure that the security code is valid for a short period of time and getting invalid after its use, performs a "specific algorithm."

Finally, attempting to replace the computers with humans performing a manual method would weaken the claimed authentication method goal of authentication of users who are online or remote. For a face-to-face authentication there has always been an identification method available via driver license or similar identification. There is therefore no need for human involvement to perform further authentication via code. The Asserted Patents resolve the issues with other available technologies such as smart card or biometric authentication methods (e.g., expense and need for complicated specialized equipment for average online users). These claims are therefore inextricably tied to and only possible via computer technology by their purpose of providing a secure, easy to use and low cost authentication method for average users who are required to be authenticated remotely while being online and eliminating the need for ID or personal involvement in identification.

As an example, consider just Claim 1 of the '453 Patent. Claim 1 of the '453 is patent eligible at step 1 because its focus is solving the computer-specific problem of computer network security, remote access and online user authentication. The SecureCode described in Claim 1 improves upon earlier authentication methods in terms of security, accuracy, and implementation. The specification makes clear that these improvements—owing to the dynamic nature of the SecureCode—are the patent's focus. Therefore, the patent is not directed to an abstract idea.

At *Alice* Step 1, a court considers "what the patent asserts to be the focus of the claimed advance over the prior art." *CosmoKey v. Duo*, 15 F.4th 1091, 1097 (Fed. Cir. 2021) (quotes and cites omitted). A claim is only ineligible at this step 1 if the claim's "character as a whole"—considered in light of the specification—is directed to a patent ineligible concept. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). The patent ineligible concepts are laws of nature, natural phenomena, and abstract ideas,[9] *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 78–79 (2012). "Claims purporting to improve the functioning of the computer itself, or improving an existing technological process, might not succumb to the abstract idea exception." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quotes and cites omitted). Computer security enhancements are not abstract if the claimed elements include specific improvements over prior arts. *See TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020) ("[i]mproving security ... can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem") (quoting *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018)).

---

[9] This analysis focuses on the "abstract idea" exception to eligibility because it is unlikely that the "laws of nature" or "natural phenomena" doctrines would apply here. *See Mayo*, 566 U.S. at 77 – 80 (2012) (discussing patents that are directed to laws of nature and natural phenomena).

In *Ancora*, the Federal Circuit found an authentication method eligible at Step 1 because it (1) addressed a computer-specific problem, (2) through unique claim elements, (3) which produced an improvement over prior arts. 908 F.3d at 1348 – 49. The patented verification method in that case addressed the computer-specific problem of "the vulnerability of license-authorization software to hacking." *Id.* The method employed specific characteristics of a computer's memory in a way "not previously used," and the result was "a beneficial reduction of the risk of hacking." *Id.* Therefore the patent was "directed to a solution to a computer-functionality problem" and not the abstract concept of authentication. *Id.*

Similarly, in *TecSec*, the Court found a computer encryption method went beyond the abstract concept of "multilevel security" because (1) the specification "expressly identifie[d] a deficiency" with existing multilevel security methods, (2) the claim expressly required an "object-oriented key manager" and "specified uses of a 'label'" not identified in prior art, and (3) the new method made multilevel security easier to manage than existing methods, which were "quite unwieldy, inflexible, and difficult to manage." 978 F.3d at 1295.

The claimed invention in the '453 Patent shares these characteristics on which the courts in *Ancora* and *TecSec* found patent eligibility under *Alice* Step 1.

First, the specification identifies a computer-specific problem: "Online Fraud happens because online businesses such as retailers assume that the person shopping online is the same person whose personal or financial information are given." ('453 Patent at 2:18–20.) The specification describes several existing and proposed solutions to this problem, and expressly identifies deficiencies with each, including "cost and consumer adoption," difficulty of use and management, vulnerability to theft, and "customer privacy concerns." (*Id.* at 5:46 – 6:40.)

Second, Claim 1 addresses these problems through the SecureCode's specific features and specific sequencing and time dependent aspects of the claims, namely that the SecureCode is sent to the user at the start of an electronic communication (Claim 1[d]), becomes invalid after a predetermined time elapses (Claim 1[e]), and is valid for only a single authentication attempt (Claim 1[f]). This combination of features is unique to the claimed invention and is not found in the prior art.

Third, the specification explains precisely how these new features improve upon the prior arts. Specifically, a dynamic SecureCode is harder steal than static keys (including PIN numbers and shared knowledge). (*Id.* at 7:3-14.) Even if it *is* stolen, it can only be used once and for a short time, mitigating the damage a hacker or online identity thief can cause. (*Id.* at 11:28–34.)

Thus, the focus of the claims of the Asserted Patents is an improvement in computer functionality, not an abstract idea.

C.    *Alice* **Step 2: The Claims Contain an Inventive Concept.**

If a claim fails *Alice* step one, the Court next looks to whether the claims include an inventive concept. The Asserted Claims pass *Alice* Step one and also pass *Alice* step two because they incorporate novel aspects into the claimed method, as already determined by the USPTO in examination of six separate patents. Thus even if the claims were found to be based upon an abstract idea, the elements of the claims transform the claims into patent eligible subject matter, through the *Alice* Step two analysis.

Under step 2, a court considers "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (2014) (quoting *Mayo*, 566 U.S. at 77–78(2012)). This additional element must be an "inventive concept" that does more than "simply recite well-understood, routine, conventional activity." *Universal Secure Registry LLC*

*v. Apple Inc.,* 10 F. 4th 1342, 1346 (Fed. Cir. 2021).  "In cases involving authentication technology, patent eligibility often turns on whether the claims provide sufficient specificity to constitute an improvement to computer functionality itself."  *Id.*  But the presence of an inventive concept "must be decided on a case-by-case basis in light of the particular claim limitations, patent specification, and invention at issue."  *CosmoKey v. Duo*, 15 F.4th at 1099 (Fed. Cir. 2021).

In *CosmoKey v. Duo*, the Federal Circuit found that an authentication method improved the functionality of computer systems because it constituted a "specific improvement to authentication that increases security, prevents unauthorized access by a third party, is easily implemented, and can advantageously be carried out with mobile devices of low complexity." *See id.*  Under this rationale, the predefined arrangement of computers in predefined forms of communications with the user and the claimed SecureCode technology constitutes an inventive concept because it improves the functionality of computer security systems. Just like the claimed invention found eligible in *CosmoKey*, the '453 Patent specification describes "specific improvement(s) to authentication" including that it "reduces the identity theft, fraud and customer privacy concerns," "will offer a high level of assurance that an individual is who he/she claims," and "will provide a real time authentication solution" that is "secure, easy to use and manage" and "inexpensive."  ('453 Pat. at 6:28-40, 11:15–60.)

In addition, the claimed invention also meets the "specificity" requirement because it has concrete, specific features which differ from prior art.  The authentication patent in *CosmoKey v. Duo* was sufficiently specific because it contained four claim steps that were not mentioned in prior art: (1) checking for a predetermined time relation between request and response, (2) ensuring the authentication function is normally inactive, (3) ensuring the response indicates

authentication function is now active, and (4) "thereafter ensuring authentication function is automatically deactivated." 15 F.4th at 1098 (Fed. Cir. 2021). The '453 patent contains similarly specific claim steps to define the features of the SecureCode, including at least the following: claim 1[d] specifies a method of generating and transmitting the SecureCode to the user after the user initiates a communication; claim 1[e] specifies that this SecureCode will be valid for only a predetermined time; and claim 1[f] specifies that the SecureCode will become invalid after a first use.  ('453 Pat. at Claim 1.)  The specification attributes specific security advantages to this set of features, for instance that "it will not matter whether a keystroke logger records [an individual's authentication information], because one of the keys is dynamic and may expire the moment the hacker gets it."  (*Id.* at p. 11:32-34.)

For these reasons, even if a court finds that the claims of the Asserted Patents are not eligible under *Alice* Step 1, the claimed inventions still survive the challenge under Step 2.

### D.    The U.S.P.T.O. Patent Eligibility Guidelines Indicate The Claims Of The Asserted Patent Are Directed To Patent Eligible Subject Matter.

Approximately six months after the Virginia Court ruled on patent ineligibility of the '432 Patent claims, the U.S.P.T.O. published new guidelines that directly refute the self-serving Section 101 arguments that Defendants makes in this proceeding.

The "Subject Matter Eligibility Examples: Business Methods" guidelines are published periodically by the U.S.P.T.O. ("the Office"), with the relevant update (Example 35) in this matter being published in December 2016 (after the Virginia Court's July 2016 determination).

In light of the difficulty in understanding the various rulings and interpretations following the *Alice* decision, the Office published example claims with detailed explanations why each claim is or is not patentable under the *Alice* analysis.  The Examples are intended to guide patent examiners as they determine whether a given claim is directed to patent eligible subject matter.

Particularly relevant to this case is Example 35, which relates to claims directed to "Verifying A Bank Customer's Identity To Permit An ATM Transaction."  (**Exhibit A**, Page 98.) In the prefatory remarks to Example 35, the Office explains:

> [Example 35] Claim 1 is ineligible, because it is directed to an abstract idea and does not recite additional elements that amount to significantly more. [Example 35] Claims 2 and 3 are directed to the same abstract idea, <u>but are eligible because they have additional elements that amount to significantly more than the abstract idea (i.e., provide an inventive concept) because they implement the abstract idea with specific meaningful limitations</u>.

Example 35 sample claim 1 presents a simple (allegedly patent-ineligible claim) that reads as follows:

> 1. A method of conducting a secure automated teller transaction with a financial institution by authenticating a customer's identity, comprising the steps of:
>
> obtaining customer-specific information from a bank card,
>
> comparing, by a processor, the obtained customer-specific information with customer information from the financial institution to verify the customer's identity, and
>
> determining whether the transaction should proceed when a match from the comparison verifies the authenticity of the customer's identity.  (**Exhibit A**, Page 100)

The Office then explains that this claim passes Step 1 of the *Alice* analysis because "the claim is directed to a process, which is a statutory category of invention (*Step 1: Yes*)." (**Exhibit A**, Page 101.)  However, according to the guidelines, Example 35 sample claim 1 fails step 2 because it describes a "long prevalent" business practice and is directed to "an abstract mental process for detecting fraud by obtaining and comparing intangible data pertinent to business risks" but does not show an inventive concept at least in part because the steps do not "improv[e] a technical field."  (*Id.*, Page 101-102.)  Thus it was mere automation of a process that "does not provide significantly more."

The Office then presents a longer claim in Example 35 sample claim 2 that is patent-eligible under the Alice analysis because the **combination** of the steps improves the technical field.  (*Id*., Page 103).  This claim reads as follows:

2. A method of conducting a secure automated teller transaction with a financial institution by authenticating a customer's identity, comprising the steps of:

obtaining customer-<u>specific information from a bank card</u>,

comparing, by a processor, the obtained customer-specific information with customer information from the financial institution to verify the customer's identity, <u>by generating a random code and transmitting it to a mobile communication device that is registered to the customer</u> associated with the bank card,

reading, by the automated teller machine, an image from the customer's mobile communication device that is generated in response to receipt of the random code, <u>wherein the image includes encrypted code data</u>, <u>decrypting the code data from the read</u> image, and

<u>analyzing the decrypted code data</u> from the read image and the generated code to determine if the decrypted code data from the read image matches the generated code data, and

determining whether the transaction should proceed when a match from the analysis verifies the authenticity of the customer's identity.  (**Exhibit A**, Page 101, emphasis added.)[10]

Again, the claim passes step 1 of the Alice analysis because it is a process, and therefore directed to statutory subject matter.  But the claim also passes step 2 of the analysis because of the additional improvements that the claim recites as elements.

However, the **combination** of the steps (*e.g*., <u>the ATM providing a random code, the mobile communication device's generation of the image having encrypted code data in response to the random code, the ATM's decryption and analysis of the code data, and the subsequent determination of whether the transaction should proceed based on the analysis of the code data</u>) operates in a nonconventional and non-generic way to ensure that the customer's identity is verified in a secure manner that is more than the conventional verification process employed by an ATM alone. <u>In combination, these steps do not represent merely gathering data for comparison or security purposes, but instead set up a sequence of events that address unique problems associated with bank cards and ATMs</u> (*e.g*., the use of stolen or "skimmed" bank cards and/or customer

---

[10] Example 35 sample claim 3 recites similar elements and in many respects is even closer to Plaintiff's Asserted Claims.  The Office's analysis of why sample claim 3 is patentable is the same as its analysis of sample claim 2.

information to perform unauthorized transactions). Thus, like in *BASCOM*, the claimed combination of additional elements presents a specific, discrete implementation of the abstract idea.  (**Exhibit A**, Page 103, emphasis added.)

The analogy to the claims of the Asserted Patents is immediately apparent.  The "specific information from a bank card" is analogous to the user identity or digital identity in the Asserted Patents.  Example 35 sample claim 2 also recites an element involving "generating a random code and transmitting it to a mobile communication device that is registered to the customer."  In the Asserted Patents, this is directly analogous to the generation of the dynamic code and sending it to the user's computer or device (such as a cell phone).  Likewise, encrypting and decrypting the code (e.g., a SecureCode or dynamic code) is also recited in the Asserted Patents.

The Office then notes that a key component to the patent eligibility of the example claim is that the process "differs from the routine and convention sequence of events" because it uses a different method of verification than normal.  The Office explains that in the conventional ATM transaction, security is provided by providing a PIN, but in this new and inventive method a digital code unique to this transaction is used:

> Further, the combination of obtaining information from the mobile communication device (instead of the ATM keypad) and using the image (instead of a PIN) to verify the customer's identity by matching identification information does not merely select information by content or source, in contrast to *Electric Power,* but instead describes a process that differs from the routine and conventional sequence of events normally conducted by ATM verification, such as entering a PIN, similar to the unconventional sequence of events in *DDR*. The additional elements in claim 2 thus represent significantly more (*i.e.,* provide an inventive concept) because they are a practical implementation of the abstract idea of fraud prevention that performs identity verification in a non-conventional and non-generic way, even though the steps use well-known components (a processor and mobile communication device).  (Exhibit A, Page 103.)

The obvious direct comparison to the Asserted Patents is that each claim recites a specific series of steps (or systems) that use a secure digital code that is unique to the particular transaction instead of the user's password (analogous to the ATM PIN).

27

The Office then concludes the analysis by stating that all elements of the *Alice* analysis are satisfied and example claim 2 is patent-eligible under these guidelines.  The same conclusion applies here: the Asserted Patents are directed to patent-eligible subject matter under the USPTO's  internal guidelines for patent examiners.

## VII.    CLAIM CONSTRUCTION ISSUES RAISED BY DEFENDANTS PREVENT THE COURT FROM DECIDING INVALIDITY ON A 12(B)6 MOTION

Although in some cases "claim construction is not an inviolable prerequisite to a validity determination under § 101"  *Content Extraction and Trans. v. Wells Fargo Bank*, 776 F. 3d 1343, 1349 (Fed. Cir. 2014); however, when the meaning of elements are called into dispute by the moving party, and the meaning of other elements is ignored, claim construction must come before a § 101 determination. The issue in this case, as framed by Defendants, surrounds the term "External-Entity" and "Central-Entity" while misrepresenting the applicability of "face-to-face" communication discussed in the Asserted Patents.  (Motion at 31.)  Proper construction of "External-Entity" and "Central-Entity" requires evidence from the perspective of the person of ordinary skill in the art, before subject matter eligibility can be determined.

Defendants merely brush past the specific terms used in the Asserted Patent claims, asserting that they are simply synonyms for terms used in the '432 Patent.  As described above, it is clear that, at least under the analysis performed by the Virginia Court, the terms in the '432 Patent had a different meaning than is meant by the terms used in the Asserted Patents.

For example, the term "External-Entity" is not used in the Asserted Patents; instead "website" "online computer system" "computer network" and "computer system" are deliberately used in the Asserted Patents.  It is important to determine the meaning and scope of each of these claims – and whether they are distinguishable from the "External-Entity" the Virginia Court misconstrued – before patent eligibility analysis takes place.  At the very least, if

these terms do place the invention in a purely online communication context, then the subject matter must be different than that determined by the Virginia Court. Additionally, the construction of these terms has bearing on whether the use of these devices or apparatuses elevates the invention beyond the conventional use of authenticators in prior settings. (See discussion of Example 35, supra.)

Likewise, the term "Central-Entity" is not used in the Asserted Patents. Instead, the Asserted Patents specify that a "Trusted Authentication System" or "Trusted Authenticator" is used. For the same reasons as discussed immediately above, claim construction is important to understanding the scope of the subject matter claimed in the Asserted Patents. For example, if the claimed authenticators are in an online communication setting, then the operation of the dynamic codes (how they are generated, transmitted, relayed to the authenticator and e-commerce provider, and how they are compared to the original code and digital identity) are key aspects of the invention. Again, reference to Example 35, above, is instructive in understanding the importance of these terms and how they affect the subject matter of the claims.

Accordingly, Plaintiff asks that, at a minimum, the question of patent eligibility under Section 101 be addressed only after claim construction has occurred, claim construction of the terms at issue here, not constriction of different terms as construed by the Virginia Court six years ago and thus the scope of the Asserted Patent claims can be accurately assessed.

## VIII.    WILLFUL AND INDIRECT INFRINGEMENT

Plaintiff does concede that there are currently no specific factual allegations of pre-suit notification or knowledge regarding the Asserted Patents in the Second Amended Complaint. Plaintiff therefore concedes that on the pleadings as currently constituted, willfulness and inducement allegations are not fully pled. However, Plaintiff requests that, if these issues are dismissed, they be dismissed without prejudice and that Plaintiff be allowed to conduct discovery

regarding willfulness and inducement and that Plaintiff be allowed to re-plead those theories at a later point, should evidence be adduced during discovery.

## IX. IN THE ALTERNATIVE, LEAVE TO AMEND THE COMPLAINT SHOULD BE GRANTED

In the event the court grants any portion of the Motion to Dismiss, Plaintiff requests that the Motion be granted only with leave to amend the Complaint. If so required, Plaintiff should be granted the opportunity to amend the complaint to more fully address and resolve the issues raised in the complaint, including, for example, by reciting additional claims in the Asserted Patents, and how their inventive additions contribute to patent eligibility.

## X. CONCLUSION

Defendants' motion on the record should be denied because (i) it is unsupported by the record, (ii) there is no evidence to overcome the presumption of validity (iii) the claims of the Asserted Patents recite patent eligible subject matter.


Dated: November 14, 2024                    Respectfully submitted,


                                            _____/s/ Joseph J. Zito_____.
                                            Joseph J. Zito
                                            1250 Connecticut Avenue, NW, #700
                                            Washington, DC 20036
                                            202-466-3500
                                            jzito@dnlzito.com

                                            *Attorneys for Plaintiff*
                                            *Factor2 Multimedia Systems, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing

document has been served on all parties via the Court's CM/ECF system on November 14, 2024.

                      */s/ Joseph J. Zito*
                      Joseph J. Zito
                      DNL ZITO
                      1250 Connecticut Avenue, NW, #700
                      Washington, DC 20036
                      202-466-3500
                      jzito@dnlzito.com

                      *Attorneys for Plaintiff*
                      *Factor2 Multimedia Systems, LLC*